## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**SYLVESTER T. WATKINS**

**Plaintiff,**

**v.**                                    **Civil Action No. _____**

**NORFOLK STATE UNIVERSITY**

**and**

**THE VISITORS OF NORFOLK STATE UNIVERSITY,**

**Defendants.**

## COMPLAINT

Sylvester T. Watkins, by counsel, files this Complaint and demands judgment against Defendants on the grounds and in the amounts set forth below.

### PARTIES

1. Sylvester T. Watkins ("Watkins" or "Plaintiff") is an individual residing in the City of Chesapeake, Virginia.

2. The board of visitors of Norfolk State University compose a corporation organized and existing under the laws of the Commonwealth of Virginia, Va. Code § 23-174.1 *et seq.*, under the style of "The Visitors of Norfolk State University," formed for the purpose of establishing and maintaining, and at all relevant time maintaining and operating, a university in the name and style of "Norfolk State University." As used herein, The Visitors of Norfolk State University and Norfolk State University are referred to collectively as "NSU." NSU is an agency of the Commonwealth of Virginia, is a person within the meaning of 42 U.S.C. § 2000e(a), and is an employer within the meaning of 42 U.S.C. § 2000e(b).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5 (Title VII of the Civil Rights Act of 1964).

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims asserted here occurred in the Eastern District of Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      On June 21, 2019, Watkins filed a charge of discrimination with the United States Equal Employment Opportunity Commission, charge number 437-2019-00564, a copy of which is attached hereto as Exhibit 1.

6.      On September 3, 2020, the United States Equal Employment Opportunity Commission issued to Watkins a Dismissal and Notice of Rights on the aforementioned charge of discrimination, a copy of which is attached hereto as Exhibit 2.

7.      This action was filed within 90 days of Watkin's receipt of the aforementioned Dismissal and Notice of Rights.

8.      Watkins has satisfied all procedural prerequisites for the filing of this action.

## FACTS

9.      In May of 2018, Watkins began his employment with NSU as the NSU Director of Human Resources.

10.      Throughout Watkins' employment with NSU, Watkins' performance of his job duties met or exceeded the legitimate performance expectations of NSU.

11.      Throughout Watkins' employment with NSU, Watkins received satisfactory or better job performance evaluations.

12.     As the NSU Human Resources Director, Watkins' job duties included ensuring that all complaints or reports of potential sex discrimination, sexual harassment, hostile work environment based on sex, or other alleged discriminatory conduct potentially violating Title VII of the Civil Rights Act of 1964, and all complaints or reports of potential retaliation violating Title VII, 42 U.S. Code § 2000e-3(a), are investigated and that appropriate corrective action, if necessary, is taken.  As used herein, such a complaint or reports is referred to as an "EEO Complaint" and an investigation of an EEO Complaint is referred to as an "EEO Investigation."

13.     As used herein, "NSU Upper Management" refers to certain persons holding the highest level management positions in NSU, not including Watkins, which throughout Watkins' employment with NSU included but were not necessarily limited to the following:

a.     President Melvin Stith ("Stith"),

b.     Vice President of Finance & Administration Gerald Hunter ("Hunter"),

c.     University Counsel Pamela Boston ("Boston"), and

d.     Chief Audit Executive Harry Aristakesian ("Aristakesian").

14.     At all relevant times throughout Watkins' employment with NSU, NSU maintained an Internal Audit Department, and the head of that department was Aristakesian.

15.     As Chief Audit Executive, Aristakesian reported to the President of NSU and to the NSU Board of Visitors.

16.     In 2017 and 2018, Colleen Munday (aka Coleen Porter) ("Munday") was a female employed by NSU in the NSU Internal Audit Department as an auditor, and as such reported to Aristakesian.

17.     In June of 2018, Munday contacted Watkins in his capacity as the NSU Human Resources Director and informed him that she wished to meet with him.  They met on June 15,

3

2018, at which time Munday gave Watkins two weeks notice of her resignation from NSU, and informed Watkins that she was resigning because of what she felt was mistreatment of her by Aristakesian, including alleged discrimination by Aristakesian against her because she is female.

18.     In July of 2018, Watkins directed Lisa Little ("Little"), who was the Employee Relations Manager in the NSU Human Resources Department, to investigate Munday's concerns, and Little proceeded to do so.

19.     In the course of Little's investigation, Little interviewed Munday and received from Munday a ten page document titled "Daily Document" which Munday began writing on January 26, 2018 and in which she made entries from time to time thereafter, describing her concerns about her work environment under Aristakesian, and in which Munday alleged Aristakesian engaged in "bullying and harassment" of her, Munday alleged Aristakesian made "demeaning critiques towards me because I am a woman," and Munday stated "I feel as though when I talk to him [Aristakesian] as a woman in a staff position, my decision is never good enough...."  Such allegations by Munday are referred to herein as the "Munday EEO Complaint," and such investigation of the Munday EEO Complaint by the NSU Human Resources Department is referred to herein as the "Munday EEO Investigation."

20.     In late August of 2018 Little, in the course of Little's investigation, also interviewed Aristakesian.

21.     During the investigation of Munday's complaints, Little informed Watkins that Aristakesian had been the subject of similar complaints in the past, and that the first of them was a complaint by Sylvia Martin ("Martin"), who was another female subordinate of Aristakesian in the NSU Internal Audit Department.  Little gave Watkins a copy of a two-page written complaint against Aristakesian which Martin, after being fired by Aristakesian, had given to Watkin's

predecessor as the NSU Human Resources Director, Mona Adkins-Easley ("Adkins-Easley"). In Martin's written complaint Martin alleged Aristakesian was "controlling and demeaning" toward Martin, and Martin stated "I understand that discrimination is not acceptable at NSU but Harry has treated me in this way from a gender standpoint...." Such allegations by Martin are referred to herein as the "Martin EEO Complaint."

22. Watkins determined that Martin's complaint against Aristakesian had never been investigated, and so he directed Little to conduct an investigation of Martin's complaint as soon as Little finished her investigation of Munday's complaints. The investigation of the Martin EEO Complaint by the NSU Human Resources Department is referred to herein as the "Martin EEO Investigation."

23. The NSU Board of Visitors and certain members of NSU Upper Management, including but not limited to Boston and Aristakesian, learned of the Munday and Martin EEO Complaints, learned that the NSU Human Resources Department was conducting the Munday and Martin EEO Investigations, did not want any action to be taken on the Munday and Martin EEO Complaints, and wanted Watkins to immediately terminate the Munday and Martin EEO Investigations.

24. In an effort to cause Watkins to immediately terminate the Munday and Martin EEO Investigations and take no action on the Munday and Martin EEO Complaints, on or about September 5, 2018, Boston met with Watkins and asked Watkins why Watkins was conducting an investigation of Aristakesian. Watkins explained the allegations and why the investigation was necessary. Boston admonished Watkins that the Board of Visitors would not like Watkins investigating Aristakesian, and that Watkins should terminate the Munday and Martin investigations. Watkins advised Boston that his duties as the NSU Human Resources Director

5

required him to investigate the allegations against Aristakesian. That evening, Watkins

forwarding to Boston a copy of the "Daily Document" by Munday.

26. The September 5, 2018 meeting of Watkins and Boston made it clear to the NSU

Board and certain members of NSU Upper Management that Watkins was proceeding with the

Munday and Martin EEO Investigations and possibly would take action against Aristakesian

based on the Munday and Martin EEO Complaints.

26. Because Watkins proceeded with the Munday and Martin EEO Investigations,

certain members of NSU Upper Management and the NSU Board of Visitors began taking

actions, described below, to bring about the termination of Watkins' employment with NSU and,

pending such termination, to prevent Watkins from continuing the Munday and Martin EEO

Investigations and to prevent Watkins from taking action against Aristakesian based on those

investigations.

27. The member of NSU Upper Management to whom Watkins reported as the NSU

Human Resources Director was changed from NSU Chief of Staff Carl Haywood ("Haywood")

to Hunter. This was done because it was believed that Haywood was or might be unwilling to

interfere with the Munday and Martin EEO Investigations and retaliate against Watson for

conducting those investigations.

28. In or about early 2019, NSU Upper Management and the NSU Board of Visitors

created a new position outside the NSU Human Resources Department, "Chief Diversity

Officer," who reported to the Chief of Staff. All EEO matters were to be removed from the NSU

Human Resources Department and transferred to the Chief Diversity Officer. This action was

taken for the purpose of stripping Watkins of control over the Munday and Martin EEO

Investigations and Complaints, and all other EEO matters.  This action had that effect, and
substantially reduced Watkin's authority as Human Resources Director.

29.     In February 2019, Hunter issued a request for proposal for a human resources
consultant to review and make recommendations concerning the operation of the Human
Resources Department and concerning the job performance of Watkins, and in March of 2019
hired a consultant to perform those services.  There was no legitimate need for the services
performed by the consultant, and the consultant was solicited and hired for the purpose of
creating a pretextual justification for terminating Watkins' employment in retaliation or Watkins'
actions regarding the Munday and Martin EEO Investigations and Complaints.

30.     On May 3, 2019, Hunter told Watkins that "you may need to start looking for
another job, at the Board of Visitors is going in a different direction."

31.     After the May 3, 2019 admonition by Hunter to Watkins for Watkins to "start
looking for a new job," Hunter began scrutinizing Watkin's work for the purpose of finding
grounds to terminate Watkin's employment.

32.     On June 4, 2019, Gerald Hunter placed Watkins on paid administrative leave
because, according to Hunter, "we are doing something different with your position."

33.     On June 5, 2019, Hunter informed Watkins that NSU is investigating complaints
recently made by two employees against Watkins and that Watkins should remain on paid
administrative leave pending the conclusion of that investigation, and Hunter delivered to
Watkins a letter dated June 5, 2019, a copy of which is attached hereto as Exhibit 3, stating
Watkins was barred from NSU property based on a June 3, 2019 meeting of the NSU "Threat
Assessment Team" pursuant to the Campus and Workplace Violence Prevention Policy.

34.     There was no reasonable basis for NSU deeming Watkins a potential safety risk, and Hunter's stated justification for doing so was pretextual.

35.     Neither Hunter nor any other NSU employee or representative, then or at any time since, informed Watkins of any of the accusations purportedly made against him, the identity of the purported accusers, or the basis for barring him from the campus, and no NSU employee or representative ever conducted an interview of him as part any investigation of the purported complaints or the purported safety threat.

36.     On June 21, 2019, Watkins filed a charge of discrimination with the EEOC, a copy of which is attached hereto as Exhibit 1.

37.     The EEOC served a copy of the Hunter EEOC Charge upon NSU within days after it was filed.

38.     In August of 2019 Hunter informed Watkins that Watkins' employment contract with NSU would not be renewed.

39.     Hunter then assigned Watkins to report for work at an office in the Virginia Beach Higher Education Campus, but stripped Watkins of his job title and all of his job duties.  From them until February 29, 2020, Hunter's job was to sit at a desk at the Higher Education Campus with nothing to do.

40.     February 29, 2020, NSU terminated Hunter's employment.

### COUNT 1

### RETALIATION IN VIOLATION OF TITLE VII

41.     The allegations set forth in this Complaint are incorporated into this Count by reference as if fully set forth herein.

42. NSU, by the actions described herein, discriminated against Watkins because Watkins opposed discrimination on the basis of sex made an unlawful employment practice under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S. Code § 2000e-3(a).

43. NSU, by the actions described herein, discriminated against Watkins because Watkins participated in investigations of discrimination on the basis of sex made an unlawful employment practice under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S. Code § 2000e-3(a).

44. As a direct and proximate result thereof, Watkins has suffered and will continue to suffer loss of wages and employee benefits; has suffered and will continue to suffer injury to his professional and personal reputation; has been caused great inconvenience; has suffered pecuniary losses; has expended time and effort to obtain alternative employment; and has suffered and continues to suffer embarrassment, humiliation, anger, outrage, worthlessness, despondence, sadness, hopelessness, loss of self-esteem, nightmares, and depression and anxiety accompanied by physical symptoms including severely elevated blood pressure, severe heart palpitations, feelings of chest pressure, neck pain, insomnia, lethargy, fatigue, impaired memory, and impaired concentration, as a result of which Watkins has expended and continues to expend money and time for related care and treatment by mental health care providers and medication.

WHEREFORE Watkins demands judgment against Defendants, and as relief demands the following:

a. A declaratory judgment that Defendants violated Title VII of the Civil Rights Act of 1964.

9

b.      Reinstatement to his former position or an comparable position with comparable

pay and benefits;

c.      Back pay in an amount to be determined at trial.

b.      Front pay in an amount to be determined at trial;

e.      Pecuniary damages in an amount to be determined at trial;

f.      Compensatory damages in amount not less than $150,000;

g.      If compensatory damages are not awarded, then nominal damages;

h.      Pre-judgment interest;

i.      Post-judgment interest;

j.      Plaintiff's costs and expenses incurred herein including but not limited to expert

witness fees and reasonable attorney's fees; and

k.      Such other and further relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

**SYLVESTER T. WATKINS**

By:  _Ray Hogge_

Raymond L. Hogge, Jr.
VSB No. 29445
Counsel for Sylvester T. Watkins
Hogge Law
500 E. Plume Street, Suite 800
Norfolk, VA 23510
Tel: (757) 961-5400
Fax: (757) 962-5979
rayhogge@virginialaborlaw.com

December 2, 2020