IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SYLVESTER T. WATKINS,            )
    Plaintiff,                              )
        v.                                        )    Civil Action No.  2:20cv608 (RCY)
NORFOLK STATE UNIVERSITY, *et al.*, )
    Defendants.                         )
                               )

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion to Dismiss, *With Prejudice*, Plaintiff's Complaint (ECF No. 7). The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated below, the Court will grant in part and deny in part Defendant's Motion to Dismiss.

**I. BACKGROUND[1]**

Sylvester Watkins ("Watkins" or "Plaintiff") began his employment at Norfolk State University[2] in May of 2018 as the Director of Human Resources ("Director of HR"). (Compl. ¶ 9.)  As Director of HR, Watkins' duties included ensuring that all complaints or reports of discriminatory or retaliatory conduct potentially violative of Title VII of the Civil Rights Act of 1964 were investigated, and that appropriate corrective actions were taken if necessary. (*Id.* ¶ 12.)

On June 15, 2018, Watkins met with Colleen Munday ("Munday"), a female auditor employed by NSU in the Internal Audits Department. (*Id.* ¶¶ 16-17.)  During the meeting, Munday

---

[1] In considering a motion to dismiss, a plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted). Additionally, the Court employs the pagination assigned to all documents referenced herein by the CM/ECF docketing system.

[2] The Complaint names Norfolk State University and the Visitors of Norfolk State University as defendants. (Compl. at 1, ECF No. 1.)  However, the correct corporate name of Norfolk State University is "The Visitors of Norfolk State University." (Defs.' Mem. Supp. Mot. Dismiss at 1 n.1, ECF No. 8.)  The Court will refer to Norfolk State University and the Visitors of Norfolk State University collectively as "NSU" or "Defendants."

1

gave Watkins two weeks' notice of her resignation from NSU and notified Watkins of mistreatment and sex discrimination by Harry Aristakesian ("Aristakesian"), Chief Audit Executive. (*Id.* ¶¶ 15-17.)  Following this meeting, in July 2018, Watkins directed Lisa Little ("Little"), Employee Relations Manager, to investigate Munday's allegations. (*Id.* ¶ 18.)  In the course of her investigation, Little interviewed Munday and received a document from Munday titled "Daily Document" that detailed Munday's concerns regarding her work environment under Aristakesian. (*Id.* ¶ 19.)  Munday began writing in her Daily Document on January 26, 2018, and the entries included allegations of Aristakesian harassing and bullying based on her sex. (*Id.*)  Munday's allegations shall be referred to as the "Munday EEO Complaint." (*Id.*)   Little also interviewed Aristakesian in late August of 2018. (*Id.* ¶ 20.)  During her investigation, Little discovered that Aristakesian had been the subject of similar sex discrimination complaints in the past. (*Id.* ¶ 21.)  Specifically, Sylvia Martin ("Martin"), a former female subordinate of Aristakesian in the Internal Audit Department, accused Aristakesian of "controlling and demeaning" behavior toward her. (*Id.*)  After Aristakesian terminated Martin's employment, Martin submitted a two-page written complaint against Aristakesian ("Martin EEO Complaint") to Watkins' predecessor, stating in part, "I understand that discrimination is not acceptable to NSU but Harry has treated me in this way from a gender standpoint…." (*Id.*)  Watkins determined that Martin's EEO Complaint had never been investigated so he directed Little to conduct an investigation of Martin's EEO Complaint after she completed her investigation of Munday's EEO Complaint. (*Id.* ¶ 22.)

At some point after the Munday investigation commenced, the NSU Board of Visitors and members of NSU upper management learned of the Munday and Martin EEO Complaints and the ongoing investigations. (*Id.* ¶ 23.) On September 5, 2018, Watkins met with Pamela Boston

("Boston"), University Counsel. (*Id.* ¶¶ 13, 24.)  During the meeting, Boston asked Watkins about the purpose of the Aristakesian investigation and admonished Watkins, explaining that the Board of Visitors would not like Watkins investigating Aristakesian. (*Id.* ¶ 24.)  Boston advised Watkins to terminate the Munday and Martin EEO investigations, but Watkins asserted that his duties as the NSU Director of HR required him to investigate the allegations against Aristakesian. (*Id.*)  That evening, Watkins forwarded Boston a copy of Munday's Daily Document. (*Id.*)  According to Watkins, the September 5 meeting made it clear that Watkins was proceeding with the Munday and Martin EEO investigations despite disapproval from Boston, members of NSU upper management, and the NSU Board of visitors. (*Id.* ¶¶ 25-26.)  Sometime after the September 5 meeting, the NSU upper management member to whom Watkins reported was changed from Carl Haywood ("Haywood"), NSU Chief of Staff, to Gerald Hunter ("Hunter"), Vice President of Finance & Administration. (*Id.* ¶¶ 13, 27.)  Around early 2019, NSU created a new position titled "Chief Diversity Officer," which was outside of the NSU Human Resources Department. (*Id.* ¶ 28.)  The Chief Diversity Officer was to report to the Chief of Staff, and all EEO matters were to be removed from the NSU Human Resources Department and transferred to the Chief Diversity Officer. (*Id.*)  In effect, this transition substantially reduced Watkins' authority as Director of HR. (*Id.*)

In March of 2019, Hunter hired a human resources consultant to conduct a review and make recommendations regarding the operation of NSU's Human Resources Department and Watkins' job performance. (*Id.* ¶ 29.)  On May 3, 2019, Hunter told Watkins, "you may need to start looking for another job, at [sic] the Board of Visitors is going in a different direction." (*Id.* ¶ 30.)  Following Hunter's statement, Watkins alleges that Hunter began scrutinizing Watkins' work for the purpose of finding grounds to terminate Watkins' employment. (*Id.* ¶ 31.)  On June 4, 2019,

3

Hunter placed Watkins on paid administrative leave, explaining to Watkins that "we are doing something different with your position." (*Id.* ¶ 32.) On June 5, 2019, Hunter informed Watkins that NSU was investigating complaints recently made by two employees against Watkins and that Watkins would remain on paid administrative leave pending the conclusion of the investigation. (*Id.* ¶ 33.) That same day, Hunter gave Watkins a letter stating that Watkins was barred from NSU property based on a June 3, 2019 meeting of the NSU Threat Assessment Team, pursuant to the Campus and Workplace Violence Prevention Policy. (*Id.*) According to Watkins, he was not informed of the accusations purportedly made against him, the identity of the accusers, or the basis for barring him from campus, and he was never interviewed by NSU representatives as a part of any investigation of the complaints or purported safety threat. (*Id.* ¶ 35.) On June 21, 2019, Watkins filed a charge of discrimination with the EEOC alleging retaliation. (*Id.* ¶ 36; ECF No. 1-1.) In August of 2019, Hunter informed Watkins that his employment contract with NSU would not be renewed. (Compl. ¶ 38.) Hunter then assigned Watkins to NSU's Virginia Beach Higher Education Campus and stripped Watkins of his job title and all of his job duties. (*Id.* ¶ 39.) Watkins remained at the Virginia Beach Higher Education Campus, sitting at a desk with nothing to do, until February 29, 2020, when NSU terminated Watkins' employment.[3] (*Id.* ¶¶ 39-40.)

## II. PRODECURAL HISTORY

Plaintiff filed a Complaint on December 2, 2020 (ECF No. 1). Defendants filed a Motion to Dismiss for Failure to State a Claim on May 24, 2021 (ECF No. 7). Plaintiff filed a Memorandum in Opposition to Defendants' Motion to Dismiss on June 14, 2021 (ECF No. 13). On June 28, 2021, Defendants filed a Reply to Plaintiff's Response (ECF No. 14).

---

[3] The Complaint states that Hunter sat at a desk at the Higher Education Campus with nothing to do and that NSU terminated Hunter's employment on February 29, 2020 (Compl. ¶¶ 39-40.) However, it is apparent that the use of "Hunter" was inadvertent as evidenced by the recitation of facts in the parties' briefs.

4

### III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991). The Federal Rules of Civil Procedure only require that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). In considering a motion to dismiss, a plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc.*, 7 F.3d at 1134 (citations omitted); *see also Martin*, 980 F.2d at 952. Finally, "where a motion to dismiss is filed with respect to a civil rights claim, the Court must be 'especially solicitous' of the wrongs alleged." *Edwards v. Murphy-Brown*, LLC, 760 F. Supp. 2d 607, 615 (E.D. Va. 2011).

### IV. ANALYSIS

Plaintiff alleges that Defendants retaliated against him for opposing discrimination in violation of Title VII of the Civil Rights Act of 1964. (Compl. ¶¶ 42-43.) To establish a prima facie case of retaliation under Title VII, a plaintiff must show "(1) that he engaged in a protected

activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). Defendants allege that Plaintiff has not plead a Title VII retaliatory firing claim on which relief can be granted. (Defs.' Mem. Supp. Mot. Dismiss at 7, ECF No. 8.) Specifically, Defendants argue that Plaintiff has failed to sufficiently plead that he engaged in any protected activity and failed to adequately allege a causal connection between his alleged protected activity and any adverse employment action. (*Id.* at 7-14.) The Court will review each of these elements in turn.

### A. Protected Activity

Plaintiff alleges that he engaged in protected activity by investigating the EEO complaints alleging sex discrimination against Aristakesian and by filing his EEOC charge. (Compl. ¶¶ 42-43; Pl.'s Opp. at 5-7.) There are two forms of protected activity recognized under Title VII: "(1) 'opposition' activity, i.e., 'oppos[ing] any practice made an unlawful employment practice'; and (2) 'participation' activity, i.e., 'ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Betourney v. GKN Driveline Newton, LLC*, No. 517CV00221, 2019 WL 2881558, at *5 (W.D.N.C. July 1, 2019) (quoting 42 U.S.C. § 2000e-3(a)) (citations omitted).

First, Plaintiff alleges that he engaged in opposition activity by ordering and overseeing the internal investigations into Munday's and Martin's EEO complaints of sex discrimination against Aristakesian and refusing to halt the investigations despite NSU's disapproval. (Pl.'s Opp. at 7.) The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging

6

informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015)). Defendants argue that Plaintiff failed to make any "opposition communication;" rather, Defendant asserts that Plaintiff directed a subordinate to simply investigate complaints made by two NSU employees. The parties heavily rely on *DeMasters* in support of their arguments. (Defs.' Mem Supp. Mot. Dismiss at 10-11; Pl.'s Opp. at 5-7.)

In *DeMasters*, the Court found that plaintiff engaged in opposition activity when plaintiff, as a part of his job duties, assisted another employee in having the employer investigate sexual harassment concerns. 796 F.3d at 418. The Court emphasized that plaintiff's conduct must be examined "through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole." *Id.* The "touchstone is whether the plaintiff's course of conduct as a whole (1) 'communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination,' and (2) concerns subject matter that is 'actually unlawful under Title VII' or that the employee 'reasonably believes to be unlawful.'" *Id.* (citations omitted). Further, in the context of retaliation, Title VII "must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Id.* (citing *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 283 (4th Cir. 2015)). Applying these criteria to the allegations here, the Court is satisfied that Plaintiff has alleged that he engaged in protected oppositional activity. The Complaint alleges that Plaintiff instructed Little to investigate the EEO complaints of sex discrimination from Munday and Martin. (Compl. ¶¶ 17-22.) Plaintiff then explained to Boston

7

why the investigation into Aristakesian was necessary, resisted Boston's admonition, and rejected Boston's instruction to terminate the investigations. (*Id.* ¶ 24.) Following their meeting, Plaintiff even sent Boston a copy Munday's Daily Document, containing entries of Munday's concerns about her work environment and the alleged sex discrimination that she experienced under Aristakesian. (*Id.* ¶ 19.) While Plaintiff's actions may not be as extensive as the actions described in *DeMasters*, viewed through a "panoramic lens" and in consideration of Title VII's broad protection for victims of retaliation, Plaintiff's alleged actions demonstrate that Plaintiff communicated to his employer that Munday and Martin made complaints of sex discrimination— a form of discrimination prohibited under Title VII. Second, Plaintiff alleges that he engaged in participation activity by filing his EEOC charge. (Pl.'s Opp. at 7.) The act of making an EEOC charge is a protected activity. 42 U.S.C.A. § 2000e-3(a). The question now becomes whether Plaintiff has sufficiently pled adverse employment actions and whether there is a causal connection between the protected activities and the adverse employment actions.

### B. Materially Adverse Employment Action

Plaintiff alleges that he experienced the following adverse actions: (1) NSU changed Plaintiff's supervisor from Carl Haywood to Gerald Hunter because it believed that Hunter was more likely to cooperate in its scheme than Haywood; (2) in early 2019, NSU stripped Plaintiff of his authority over all EEO investigations, including the two Plaintiff had ordered, by creating a new position and assigning all EEO investigations to the person occupying the new position; (3) in February 2019, NSU recruited and then hired a human resources consultant to review and make recommendations concerning Plaintiff's job performance in order to create a false and pretextual justification for firing him; (4) Hunter told Plaintiff that "you may need to start looking for a new job, as the Board of Visitors is going in a different direction," and began scrutinizing Plaintiff's

work; (5) on June 4, 2019, NSU put Plaintiff on paid administrative leave because, according to Hunter, NSU was doing something different with Plaintiff's position; (6) on June 5, 2019, Plaintiff was placed on administrative leave pending the conclusion of an alleged sham workplace violence investigation and was barred from NSU; (7) NSU assigned Plaintiff to work at an office in the Virginia Beach Higher Education Campus and stripped him of his job title and duties; and (8) on February 29, 2020, Plaintiff's employment contract expired and NSU terminated his employment. (Pl.'s Opp. at 8-9 (citing Compl. ¶¶ 26-40).)

The Supreme Court has held that in order to establish an adverse employment action in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "The Supreme Court emphasized that the 'materiality' requirement was necessary to ensure that only significant harms would be actionable." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213–14 (4th Cir. 2019) (citing *Burlington N.*, 548 U.S. at 68-70.) Additionally, the Supreme Court has recognized that "context matters" in retaliation cases, meaning that "rather than considering each alleged adverse employment action in isolation, courts may 'consider the cumulative effect of several allegedly retaliatory acts without converting the claim into a hostile work environment claim,' and may 'consider whether based upon the combined effect of . . . alleged events, a reasonable worker could be dissuaded from engaging in protected activity.'" *Dyer v. Oracle Corp.*, No. 16-521, 2016 WL 7048943, at *6 (D. Md. Dec. 5, 2016) (quoting *Smith v. Vilsack*, 832 F. Supp. 2d 573, 585–86 (D. Md. 2011)).

Here, being assigned a new supervisor, taken on its own, would not likely dissuade a reasonable employee from making or supporting a charge of discrimination. *See Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) (reassignment to a new position where plaintiff's salary, title, bonus eligibility, health care, and retirement benefits remained the same was not a materially adverse employment action, even where plaintiff's job responsibilities varied). However, the cumulative effect of being stripped of all authority over EEO claims; NSU hiring a consultant to evaluate Plaintiff's job performance; being told to start looking for a new job; being placed on administrative leave and given two different reasonings for being placed on leave; being banned from campus and transferred to the Virginia Beach Campus; being stripped of both job title and duties; and finally, being terminated, paints a different picture. Given this sequence of events, a reasonable jury could conclude that the combined effect of these actions could dissuade a reasonable employee from making or supporting a charge of discrimination. *See Engler v. Harris Corp.*, No. 11-3597, 2012 WL 3745710, at *3, *9 (D. Md. Aug. 28, 2012) (concluding that plaintiff's "exclusion from weekly meetings for approximately six months" was not an adverse employment action, but "when considered cumulatively" with her allegations that two former supervisors told her new supervisor that she was a "troublemaker," and her new supervisor " 'dredged up' . . . adverse reports" that had been "removed," the actions "constitute[d] material adversity under the objective standard"). Cumulatively, Plaintiff's allegations sufficiently allege materially adverse employment actions and will survive the Motion to Dismiss.

### C. Causal Connection

Defendants argue that the gap between the alleged protected activity and any adverse employment action is "too long to establish" any causal connection. (Defs.' Mem. Supp. Mot. Dismiss at 12-13.) Additionally, Defendants argue that Plaintiff's filing of a charge of

10

Discrimination with the EEOC did not cause Plaintiff's contract not to be renewed because Plaintiff admitted, in his charge and under oath, that he had already been told that his employment contract would not be renewed. (*Id.* at 7-8.) As such, the non-renewal of his employment contract could not, as a matter of law and fact, have been caused by the filing of his EEOC charge. (*Id.* at 8.)

Plaintiff argues that the Complaint alleges an ongoing and continuous series of retaliatory events connecting Plaintiff's protected activities and Defendants' actions that is more than adequate to plausibly demonstrate causation. (Pl.'s Opp. at 9-11.)  Plaintiff further argues that Defendants erroneously equate the May 3, 2019 oral suggestion made by Hunter to Watkins that "you may need to start looking for another job, as the Board of Visitors is going in a different direction," to NSU's nonrenewal of Plaintiff's contract months later and Plaintiff's discharge on February 29, 2020. (*Id.* at 11.)  Plaintiff argues that, although Hunter's suggestion did not bode well for Plaintiff's future at NSU, it was not notification that his contract would not be renewed. (*Id.*)  Further, the Complaint does not allege that Hunter had the authority to decide whether to renew Plaintiff's contract or discharge Plaintiff.

"To satisfactorily plead the third element of a claim for retaliation under the Acts, the facts in the complaint must raise the inference that the employer took the adverse employment action because the plaintiff engaged in protected activity." *Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, No. 2:11CV306, 2012 WL 699529, at *5 (E.D. Va. Feb. 29, 2012) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).  "The Fourth Circuit has held that "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Doyle v. Advanced Fraud Sols.*, LLC, No. 1:18CV885, 2020 WL 1305162, at *5 (M.D.N.C. Mar. 19, 2020) (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th

11

Cir. 2012). "[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'" *Jenkins v. Gaylord Ent. Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). However, "plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation." *Id.*

First, Plaintiff's Complaint raises the inference that Defendants engaged in the series of materially adverse employment actions due to Plaintiff's protected opposition activity. "An employee may establish prima facie causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335–36 (4th Cir. 2018). Plaintiff alleged that Defendants were aware of Plaintiff's investigation of Martin's and Munday's EEO complaints and his refusal to terminate the investigations despite Defendants' disapproval. (Compl. ¶¶ 23-25.) Additionally, Plaintiff alleged that, after his refusal to terminate the investigations, Defendants assigned Plaintiff a new manager and began taking actions to bring about Plaintiff's termination. (*Id.* ¶ 26.) Thus, Plaintiff has sufficiently plead a causal connection between his opposition activity—investigating the Munday and Martin EEO claims—and the series of materially adverse employment actions. Therefore, Plaintiff's retaliation claim as to the Munday and Martin EEO investigations will survive the Motion to Dismiss.

Second, the Complaint alleges that Plaintiff filed his EEOC charge against Defendants on June 21, 2019; then, in August of 2019, Defendants informed Plaintiff that his employment contract would not be renewed. (Compl. ¶¶ 36-38.) "[T]he Fourth Circuit has held that a period

12

of ten weeks between the protected activity and the adverse employment action may raise the inference of causation." *Evans*, 2012 WL 699529, at *5 (citing *King*, 328 F.3d at 151 & n.5). Here, Plaintiff was informed that his employment contract would not be renewed within ten weeks of filing the EEOC charge and, as such, the Court may infer causation. However, despite this inference, it is apparent from the Complaint that NSU made the decision not to renew Plaintiff's employment contract before he filed his EEOC charge. Plaintiff was informed that he "may need to start looking for a new job" on May 3, 2019; then he was informed that NSU was "doing something different with" his position and placed on administrative leave on June 4, 2019. (Compl. ¶¶ 30-32.) Both of these events occurred before he filed his EEOC charge on June 21, 2019. (*Id.* ¶ 36.) It appears that Plaintiff was well aware that NSU would not be renewing his contract before he filed his EEOC charge. Thus, Plaintiff has failed to state a causal connection between the filing of his EEOC charge and the non-renewal of his employment contract and termination. Therefore, Plaintiff's retaliation claim as to the filing of his EEOC charge will not survive the Motion to Dismiss.

## V. CONCLUSION

For the reasons detailed above, Defendant's Motion to Dismiss (ECF No. 7) will be granted in part as to Plaintiff's claim of retaliation related to the filing of his EEOC charge and denied in part as to Plaintiff's claim of retaliation related to his investigating the EEO complaints made against Aristakesian.

An appropriate Order shall issue.

/s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: March 28, 2022