**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

SYLVESTER T. WATKINS,

      Plaintiff,

           v.                              Civil Action No. 2:20cv608

NORFOLK STATE UNIVERSITY, *et al.*,

      Defendants.

**MEMORANDUM OPINION**

Sylvester T. Watkins ("Plaintiff") brings this action against Norfolk State University and the Visitors of Norfolk State University (together, "Defendants" or "NSU"). Watkins alleges NSU retaliated against him in violation of Title VII of the Civil Rights Act for overseeing sex discrimination investigations of NSU's Internal Auditor, Harry Aristakesian. Compl. ¶¶ 41–44. Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 42. As the issue is fully briefed, the matter is ripe for adjudication.[1]

For the reasons set forth below, Defendants' Motion for Summary Judgment, ECF No. 42, will be granted. Plaintiff's Motion to Exclude Expert Testimony by Karen Gulliford, ECF No. 40, will be denied as moot.

---

[1] The Court dispenses with oral argument as it would not aid in the decisional process. *See* E.D. Va. Loc. Civ. R. 7(J).

# I. BACKGROUND

## A. Facts[2]

Watkins was hired as NSU's Director of Human Resources in May 2018. Defendants' Listing of Undisputed Material Facts ("LUMF") ¶ 6, ECF No. 43. At NSU, University administration faculty and staff, including Human Resources ("HR"), are under the direction of NSU's President. *Id*. ¶ 7. At the time Watkins was hired, NSU's Interim President was Dr. Melvin T. Stith. *Id*. ¶ 8. Watkins initially reported to Stith's Chief of Staff, Carl Haywood. *Id*. Stith served as Interim President until around June 2019, when NSU's current President, Dr. Javaune Adams-Gaston, replaced him. *Id*. NSU's President, in turn, reports to the University's corporate board, the Visitors of NSU (the "Board"), which generally directs the affairs of the University. *Id*. ¶ 7. At all relevant times, Joan Wilmer was Rector of the Board. Wilmer Dep. 7:9–8:8, Pl.'s Ex. 27; Hunter Dep. 15:18–16:4, Pl's Ex. 22.[3]

At the time Watkins became HR Director, NSU's Internal Auditor, Harry Aristakesian, was conducting an ongoing audit of various NSU departments, including HR. LUMF ¶ 9. Unlike Watkins, Aristakesian reported directly to the Board. *Id*. As a part of the audit, Aristakesian sought

---

[2]    These facts are taken from the undisputed portions of NSU's statement provided pursuant to Local Rule 56(B) and the record. E.D. Va. Loc. Civ. R. 56(B). While Plaintiff was required under this rule to "list[] all material facts as to which it is contended that there exists a genuine issue necessary to be litigated," he instead offers an alternative, narrative statement of facts. *See* Pl.'s Mem. Opp. Defs.' Mot. Summ. J. at 2–19 ("Pl.'s Mem."), ECF No. 59. This frustrates the Court's ability to determine which material facts are genuinely in dispute. The Court may assume that any fact asserted as undisputed by Defendants and not refuted by Plaintiff is admitted. *See Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 346 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017). Nevertheless, the Court has conducted a searching review of the record in an effort to identify any material facts that might reasonably be in dispute.

[3]    The Court will cite to exhibits submitted by Defendants as "Defs.' Ex." Exhibits 1–22 are attached to ECF No. 43 and exhibits 23–31 are attached to ECF No. 59. The Court will cite to exhibits submitted by Plaintiff as "Pl.'s Ex." Those exhibits are attached to ECF No. 52.

information about the HR department from Watkins regarding topics such as improper hiring practices, overtime claims, and internal controls. *Id*. Watkins did not always provide this information to Aristakesian in the manner or time that Aristakesian asked for it. *Id*. ¶ 10. One of the employees who worked in Watkins' department, Lisa Little, said Aristakesian would occasionally come into the HR department to pull files and look at things himself. Little Dep. 263:19–264:6, Defs.' Ex. 17. Little recounted one instance where Watkins "got really angry," and told Aristakesian "you can't just keep coming in here and pulling records whenever you feel like it," and asked, "[h]ow do I know you're not removing things or adding things?" *Id*. 264:12–18. Little said Aristakesian responded by noting that he could "talk to the Board and have them let you know I have permission to do this." *Id*. 264:20–265:4.

Around this time, in June 2018, Watkins was contacted by a member of Aristakesian's staff, Colleen Munday. Compl. ¶ 17; Little Dep. 265:5–9, Defs.' Ex. 17. Munday told Watkins she was resigning from NSU. Watkins Dep. 163:6–14, Pl.'s Ex. 29. Watkins testified that Munday said she "felt that she was treated differently because she was a woman and she felt that she was bullied a lot and that her work was never good enough." *Id*. 163:21–164:2. Watkins said Munday "begged" him not to tell Aristakesian until after her two-week notice elapsed and she left the University. *Id*. 163:6–14. About a month later, Watkins instructed Little to investigate Munday's complaint. E-mail from Sylvester T. Watkins to Lisa M. Little (July 18, 2018), Pl.'s Ex. 6.[4] Watkins also learned that a former employee in the audit department, Sylvia Martin, had submitted

---

[4] The record is not clear as to whether Watkins directed Little to investigate at some point prior to sending the e-mail. Watkins suggested as much when he testified that he told Little to wait two weeks before starting her investigation because Munday had expressed fears of retaliation from Aristakesian. Watkins Dep. 174:11–175:15. However, Little testified that Watkins told her about the incident *after* Munday had already left the organization. Little Dep. 101:9–16, Pl.'s Ex. 24.

a document upon her resignation raising concerns about Aristakesian. LUMF ¶ 27. Martin's resignation preceded Watkins' tenure as HR Director. *Id*. In the document, Martin recounted negative interactions with Aristakesian and stated he "treated [her] in this way from a gender standpoint and even retaliation." Letter from Sylvia Martin (undated), Pl.'s Ex. 4. Watkins directed Little to investigate Martin's allegations, as well. LUMF ¶ 27.

Little started an investigation into Munday's complaint and received documents recounting Munday's concerns working in the audit department. *Id*. ¶ 26; Little Dep. 106:1–107:7, Pl.'s Ex. 24; Watkins Dep. 194:6–12, Pl.'s Ex. 29. Little interviewed Aristakesian, who denied the allegations and, according to Little, described Munday as having "performance issues." Little Dep. 109:5–13, Pl.'s Ex. 24. Little testified that she did not take any further actions on the complaint because of her workload. *Id*. 110:22–111:14.[5] As to Martin's complaint, Little said she was not able to get in touch with Martin and did not initiate an investigation. *Id*. 75:22–76:22; LUMF ¶ 27.

On or around September 5, 2018, President Stith asked University Counsel Pamela Boston to meet with Watkins regarding his investigation of Aristakesian. LUMF ¶ 29; Boston Dep. 51:2–11, Pl.'s Ex. 25. Boston testified that she asked Watkins whether he was investigating Aristakesian and Watkins confirmed that he was, based on a complaint made by Munday. Boston Dep. 53:10–20, Pl.'s Ex. 25. Boston said she responded that "[Munday] has been gone a month." *Id*. 53:18–20. Boston said Watkins asked whether she was "telling [him] not to investigate," and she responded "No, I -- I wouldn't tell you that." *Id*. 54:6–12. Watkins testified that Boston also told him that he "probably should leave it alone," and that it would "look funny to the Board of Visitors that [he was] investigating [Aristakesian] when [Aristakesian's] looking into [his] office."

---

[5]     While she did not investigate further, Little reported that Watkins "asked [her] questions a lot about that case," and she continued to include it in her weekly status meetings with him. Little Dep. 112:1–15, Defs.' Ex. 17.

Watkins Dep. 197:12–22, Pl.'s Ex. 29. After the meeting, Boston said she told President Stith, "I spoke to Watkins and he's still going to do the investigation." Boston Dep. 57:14–20, Pl.'s Ex. 25. That evening, Watkins forwarded Boston an e-mail thread between him and Little, noting "[a]lthough one would infer that it looks funny that this investigation is going on now, please look at the date the investigation was started – more than 2 months ago (July 18, 2018)." E-mail from Sylvester T. Watkins to Pamela F. Boston (Sept. 5, 2018), Pl.'s Ex. 7. The attached complaint from Munday alleged Aristakesian was treating her negatively "because [she is] a woman." Munday Complaint, Pl.'s Ex. 3.

On December 13, 2018, Watkins created a document addressed to the "Rector, Vice Rector, and members of the Board of Visitors of Norfolk State University."[6] Letter, Pl.'s Ex. 8. In the letter, Watkins wrote that the Board should be made aware of various issues, including that while he had "spen[t] countless hours providing the Audit department requested information," there was a "significant conflict of interest in presenting portions of the equation to the board" because of the ongoing investigation of "a previous employee of the Audit Department." *Id*. He also provided various examples in the letter that he had "turned this office around and made it customer friendly and accessible." *Id*.

The following day, Watkins received a "Faculty Performance Appraisal" signed by his direct supervisor, Haywood, as well as President Stith. NSU Administrative and Professional Faculty Performance Appraisal, Pl.'s Ex. 2. Watkins received a rating of "Exceptional" in

---

[6]    Defendants note that they were not able to confirm this letter was ever shared with members of the Board. Reply Pl.'s Mem. Opp. Defs.' Mot. Summ. J. at 17 n.11 ("Reply"), ECF No. 59. They indicate that discovery shows Watkins sent the letter on December 13, 2018 to Carrie Nee, an employee in the Virginia Office of the Attorney General. *See* Defs.' Fifth Am. and Suppl. Objs. and/or Resps. to Pl.'s First Set Interrog. and Req. Produc. at 12, Defs.' Ex. 31. Defendants also represent that Watkins testified he shared it with Haywood, though the portion of the testimony was not identified and does not appear to have been provided to the Court. *Id*.

"Accountability," "Leadership," "Communication," "Responsiveness/Customer Service," and "Other," which included "Critical Thinking," "Innovation," "Integrity/Ethical Behavior," and "Business Mindedness," and a rating of "Effective" in "Decision-Making." *Id*. at 1–2. The evaluation characterized Watkins as an "extremely dedicated and competent employee," who "puts in countless hours over weekends" and "[s]tabilized the department," "during a period of change for the department and University." *Id*. at 1.

The following month, in January 2019, the Board passed a resolution requiring Board approval for various personnel transactions processed by HR. LUMF ¶ 11. Wilmer, the Board's Rector, contacted Vice President of Finance and Administration, Dr. Gerald Hunter, and informed him that he would now supervise both the HR and IT departments. *Id*.; Gulliford Dep. 58:6–12, Pl.'s Ex. 26; Board Minutes (Jan. 28, 2019), Defs.' Ex. 7. Wilmer also directed Hunter to develop a process for "all personnel actions to be presented to the board for approval," to "bring in a consultant to review the human resources operation," and to "establish a chief diversity officer role and function." Hunter Dep. 16:17–17:3, Pl's Ex. 22.

Hunter brought in consultant Karen Gulliford to review the HR department on the recommendation of Linda Harber, a retired Vice President of Human Resources from George Mason University. Gulliford Dep. 51:1–15; 57:17–58:3, Pl.'s Ex. 26; Hunter Dep. 48:20–25, Pl.'s Ex. 22. On February 20, 2019, NSU issued a Request for Proposals for "Consultant Services for Human Resources" and thereafter formally retained Gulliford for the position. Request for Proposals at 4, Pl.'s Ex. 9; Hunter Dep. 51:19–22, Pl.'s Ex. 22. As outlined in the job description, Gulliford's tasks were grouped into four categories: "Data Collection," "Assess staff capability," "Create a strategy and operational plan," and "AVP of HR Search." Request for Proposals at 5, Pl.'s Ex. 9. Among other things, Gulliford was to "[p]erform an evaluation on the current leader's

6

role," and "[o]rganize a hiring process to bring on a new Associate Vice President, AVP of Human Resources by June 30, 2019, if warranted." *Id*.

On or about March 1, 2019, Hunter directed the HR department to post a position for a "Chief Diversity Officer." Hunter Dep. 141:10–143:3, Pl.'s Ex. 22; Chief Diversity Officer Posting, Pl.'s Ex. 30. This new position would conduct "EEO and Title IX investigations as a result of claims of discrimination, harassment, assault, and other complaints filed by students, faculty, staff and administrators." Chief Diversity Officer Posting, Pl.'s Ex. 30. These investigations were a part of Watkins' job responsibilities at the time. Compl. ¶ 12.

A few weeks later, Watkins resigned in an e-mail sent to Hunter. Watkins Dep. 247:1–21, Defs.' Ex. 1. Watkins said he spoke with Hunter immediately after sending the e-mail and told Hunter he "needed to leave" because people were "mak[ing] up stuff to scrutinize . . . [his] work, [his] character." *Id*. 249:8–17. Watkins said that Hunter asked him to stay because of the needs of the office, including that "the Board was asking for significant amounts of data" and "asking to approve a lot of transactions." *Id*. 248:8–14. Hunter testified that he "wanted [Watkins] to be successful." Hunter Dep. 150:5–9, Defs.' Ex. 2. Hunter said he allowed Watkins to rescind his resignation because it was "early in [Gulliford's] assessment, and [he] was still hoping [Watkins] could do the job." *Id*.

Hunter directed Gulliford to prepare a ninety-day report outlining her recommendations for the HR department. Hunter Dep. 150:11–18, Pl.'s Ex. 22; Gulliford Dep. 232:22–233:1, Pl.'s Ex. 26. As part of her assessment, Gulliford conducted interviews with HR department employees, including Watkins. LUMF ¶ 14. She also met with various members of University leadership, including Stith, Haywood, Boston, Hunter, and Aristakesian. Gulliford Dep. 63:11–64:4, Pl.'s Ex. 26. Prior to the final report, Gulliford created a document titled "Initial Findings," dated March

29, 2019.[7] Resources/Organizational Development Initial Findings, Pl.'s Ex. 12. In it, Gulliford wrote that "staff members lack[ed] formal HR training," had "[l]ow confidence in decision making," and that there was a "[s]ense of defeat and dysfunction." *Id*. at 1. As for Watkins, Gulliford wrote that "his staff does not trust him," and they "find him unpredictable." *Id*. Gulliford noted "[h]e has made some improvements," but she "[did] not believe he [was] right for the senior HR leadership, as his efforts [were] inconsistent." *Id*. at 2.

In April 2019, Gulliford presented her findings to the Board in a closed meeting. Gulliford Dep. 217:1–8, Pl.'s Ex. 26; Board of Visitors Minutes (Apr. 8, 2019), Pl.'s Ex. 13.

A month later, the Board met again. Board of Visitors Minutes (May 3, 2019), Pl.'s Ex. 14. During a break in the meeting, Watkins testified that Hunter told him, "you should start looking for another job; the Board is going in a different direction." Watkins Dep. 280:15–281:18, Pl.'s Ex. 29.[8]

On or around May 31, 2019, Gulliford said Watkins contacted her to schedule a meeting to "talk about his displeasure with the whole job." Gulliford Dep., 169:13–171:1, Defs.' Ex. 8. Gulliford said that Watkins had sent a second resignation letter to Hunter around this time, which Hunter forwarded to her. *Id*. 169:12–22. Gulliford said she met with Watkins in his office and asked him about the letter, which she said he denied sending. *Id*. 170:3–171:1. Gulliford said she

---

[7]     Gulliford testified that she does not remember whether she shared this document with NSU or with the Governor's Deputy Secretary of Administration, Grindly Johnson. Gulliford Dep. 210:12–21, Pl.'s Ex. 26. Gulliford explained that she provided Johnson updates because Johnson "was an alumni of Norfolk State and . . . said it was one of her goals to make sure that things were done in good order and done properly." *Id*. 213:7–12.

[8]     Hunter does not dispute that he and Watkins had this conversation, but stated that he said the University, rather than the Board, was going in a different direction. Hunter Dep. 155:16–22, Pl.'s Ex. 22.

"felt that [Watkins] was stressed out" and "thought he needed to be placed at home." *Id*.
169:12–19; 171:2–8. Gulliford contacted Boston and made this recommendation. *Id*. 171:9–12.
She also relayed her concern to the Virginia Department of Human Resource Management. *Id*.
174:5–21.

On Monday, June 3, 2019, Gulliford provided her formal review of the HR department,
and recommended non-renewal of Watkins' employment contract. Recommendations Report, Pl.'s
Ex. 17; Gulliford Dep. 151:3–13; 154:2–155:9, Defs.' Ex. 8. In the report, which she emailed to
Hunter, Gulliford "recommend[ed] that Mr. Watkins be given a notice of non-renewal and separate
from the University." Recommendations Report at 9, Pl.'s Ex. 17; Gulliford Dep. 155:10–16,
Defs.' Ex. 8. The report cited, among other things, "misinterpretation on several HR policies and
employee situations," "[h]iring of several unqualified friends as employees," "questionable
transactions and improper allowances," and that he has "resigned three times," an "indication he
wants to leave the University." Recommendations Report at 9, Pl.'s Ex. 17. The following day,
Hunter placed Watkins on a temporary suspension. Letter from Gerald E. Hunter to Sylvester T.
Watkins (June 5, 2019), Pl.'s Ex. 31. Until further notice, Watkins was advised not to come to
campus or contact members of the HR department. *Id*.; LUMF ¶ 24.

Thereafter, in June 2019, Watkins filed a charge of discrimination with the Virginia
Division of Human Rights and the U.S. Equal Employment Opportunity Commission ("EEOC")
alleging that NSU retaliated against him for engaging in a sexual harassment investigation of
Aristakesian. Compl., Ex. 1, ECF No. 1-1.

Two months later, Watkins received a letter from Hunter that his appointment at the
University would not be renewed and his contract would expire on February 20, 2020. LUMF
¶ 22; Letter from Gerald E. Hunter to Sylvester T. Watkins (Aug. 20, 2019), Pl.'s Ex. 18. The letter

also indicated that Watkins would serve the remainder of his term at the Virginia Beach Higher Education Center in accordance with University Policy. Letter from Gerald E. Hunter to Sylvester T. Watkins (Aug. 20, 2019), Pl.'s Ex. 18; Hunter Dep., 98:16–99:3, Pl.'s Ex. 22. Hunter testified he made the decision to non-renew Watkins' appointment on the recommendation of Gulliford. LUMF ¶ 21; Hunter Dep. 167:7–9, Defs.' Ex. 2.

### B. Procedural History

Watkins filed the instant lawsuit against NSU alleging violations of Title VII of the Civil Rights Act on December 2, 2020. ECF No. 1. NSU then moved to dismiss the Complaint for failure to state a claim. ECF No. 7. On March 28, 2022, the Court granted Defendants' Motion to Dismiss as to Watkins' claim of retaliation related to the filing of his EEOC charge and denied the Motion to Dismiss as to his claim of retaliation related to his investigation of the complaints made against Aristakesian. ECF No. 24.

Now pending before the Court are Defendants' Motion for Summary Judgment, ECF No. 42, and Watkins' Motion to Exclude Expert Testimony by Karen Gulliford, ECF No. 40.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). A fact is material if "its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Liberty Lobby Inc.*, 477 U.S. at 248). "A genuine question of material fact exists where, after reviewing

the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012) (citations omitted).

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *Wai Man Tom*, 980 F.3d at 1037 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party must then establish that specific, material facts exist which would give rise to a genuine issue. *Id.* In reaching its decision, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has . . . participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. § 2000e-3(a).

A plaintiff can prove that an employer acted with discriminatory or retaliatory intent through either direct evidence of discriminatory intent or by the burden shifting framework of *McDonnell Douglas* which provides an inference of discriminatory intent. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). Direct evidence is "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks and citation omitted). Plaintiff does not provide direct evidence of discriminatory conduct and must proceed under the *McDonnell Douglas* burden-shifting framework. *Sadeghi v.*

*Inova Health Sys.*, 251 F. Supp. 3d 978, 991 (E.D. Va. 2017), *aff'd*, 711 F. App'x 174 (4th Cir. 2018) (applying the *McDonnell Douglas* test to Title VII claims).

Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of discrimination or retaliation. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). To establish a prima facie case of retaliation under Title VII a plaintiff must demonstrate: "(1) she engaged in protected activity, (2) the employer took adverse action, and (3) there was a causal connection between the two." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998) (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985)). Once the plaintiff establishes a prima facie case, "the burden of production then shifts to the employer to articulate a . . . non-retaliatory reason for the adverse action." *Guessous*, 828 F.3d at 216. If the employer does so, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is . . . retaliatory." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981)). At this final step, the employee must show "that retaliation was a but-for cause of a challenged adverse employment action." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

Defendants assert that summary judgment is appropriate because: (1) the evidence does not establish Watkins engaged in protected oppositional activity; (2) there is not a sufficient causal connection between Watkins' activity and his non-renewal; (3) Defendants have put forward non-retaliatory reasons for his non-renewal; and (4) Watkins cannot meet his burden to show these reasons are pretextual. The Court will address these issues in turn.

1.  Protected oppositional activity

Protected activities under Title VII generally fall into two categories, opposition and participation. [9] *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015)). The threshold for establishing oppositional conduct is "not onerous." *DeMasters*, 796 F.3d at 417. The "touchstone is whether the plaintiff's course of conduct *as a whole* (1) 'communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination,' and (2) concerns subject matter that is 'actually unlawful under Title VII' or that the employee 'reasonably believes to be unlawful.'" *Id.* (first quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) and then quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015)) (emphasis in original).

NSU argues that Watkins did not engage in any "opposition" to an unlawful employment practice because he admits he was never explicitly told to terminate his investigation of Aristakesian. Mem. Law Supp. Defs.' Mot. Summ. J. at 23–24 ("Defs.' Mem."), ECF No. 43.

This argument is unavailing. Watkins established his "opposition" to an unlawful employment practice by communicating to Boston that he was investigating Aristakesian, and sharing an employee's complaint with her, which alleged discrimination on the basis of sex. LUMF

---

[9]     The Court previously rejected Watkins' retaliation claim based on alleged participation activity and need not revisit it here. *See* ECF No. 24.

¶ 26; Munday Complaint, Pl.'s Ex. 3 (stating she was treated negatively "because [she is] a woman"). While Defendants contend that there was nothing to "oppose" because Boston did not say Watkins "should terminate" the investigation, it is plain that Watkins was opposing the conduct of Aristakesian by investigating the complaint.[10] Reply at 10; *see Crawford*, 555 U.S. at 276 ("When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.") (cleaned up) (emphasis in original). This holding is consistent with the broad remedial purpose of the anti-retaliation provision of Title VII, which requires the Court to be especially protective of behaviors that oppose unlawful discrimination in the workplace. *Boyer-Liberto*, 786 F.3d at 283 ("Title VII must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic based, religion based, or gender-based discrimination.'") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006)).

NSU also argues Watkins did not engage in protected activity because Watkins could not have reasonably believed the employment practice he was opposing was unlawful because of the "suspect" nature of his investigation. Defs.' Mem. at 24–25. In order to satisfy the reasonable belief prong, the Court must consider whether Watkins "subjectively (that is, in good faith) believed" that NSU had engaged in an illegal employment practice, and whether this belief was "objectively reasonable in light of the facts." *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003)

---

[10]     Even if Boston's opposition were material to this analysis, Watkins can still show protected oppositional activity. While Boston never explicitly told Watkins he "should terminate" the investigation, she did suggest that Munday had already left the University and told Stith afterward she "spoke to Watkins and he's *still* going to do the investigation." Boston Dep. 57:14–20, Pl.'s Ex. 25 (emphasis added). Taking reasonable inferences in favor of Watkins, Boston implied Watkins should end the investigation and Watkins opposed doing that.

(internal quotation marks and citation omitted).

There is some evidence to support NSU's claim that Watkins was not acting in good faith. The fact that Watkins investigated a complaint regarding an individual who was auditing his department does not, in itself, suggest anything untoward. However, the record shows it was not standard NSU practice to investigate complaints made by former employees. Little Dep. 78:1–21, Defs.' Ex. 17 (describing it as "irregular"); *see also* Boston Dep. 53:16–22, Defs.' Ex. 18. Additionally, there is evidence that Watkins had been frustrated with Aristakesian. Little testified that Watkins mentioned his frustration in staff meetings, and at one point around the time the investigations were commenced, he "got really angry" with Aristakesian when the auditor came into the HR department to pull records. Little Dep. 264:12–265:17, Defs.' Ex. 17.

On the other hand, the underlying allegations provide an objectively reasonable basis for Watkins to have believed that Aristakesian engaged in unlawful conduct. Through the investigation, Watkins received written complaints from two former employees alleging that Aristakesian treated them differently on the basis of their sex. These allegations raise possible sex discrimination claims, but do not address each of the elements necessary to state a claim for sex discrimination. *See Gomez v. Haystax Tech., Inc.*, 292 F. Supp. 3d 676, 688 (E.D. Va. 2017), *aff'd*, 761 F. App'x 220 (4th Cir. 2019) (quoting *Young v. United Parcel Service, Inc.*, 707 F.3d 437, 449–50 (4th Cir. 2013)) (listing elements of prima facie case of sex discrimination, including membership in a protected class, satisfactory job performance, and adverse employment action). Nevertheless, by explicitly alleging they were treated negatively on the basis of their sex, it establishes a reasonable basis for Watkins to have believed sex discrimination may have occurred. Therefore, taking all reasonable inferences in favor of Watkins, he has established the requisite oppositional conduct.

2. Causal Connection[11]

In order to establish causation, the facts "must raise the inference that the employer took the adverse employment action because the plaintiff engaged in protected activity." *Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, No. 2:11-cv-306, 2012 WL 699529, at *5 (E.D. Va. Feb. 29, 2012) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish [causation]." *Dowe*, 145 F.3d at 657; *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021). "[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'" *Jenkins v. Gaylord Ent. Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The United States Court of Appeals for the Fourth Circuit has found that "a three-month lapse is too long to establish causation, without more." *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012). Similarly, a ten-week gap "weaken[s] significantly the inference of causation between the two events," unless the retaliatory action was taken at a "natural decision point." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003). "[P]laintiffs may [also] state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such

---

[11] Defendants concede that Hunter's eventual non-renewal of Watkins' employment contract constitutes an adverse employment action for purposes of establishing the second element of Plaintiff's prima facie case. Defs.' Mem. at 26 n.8. In its prior Memorandum Opinion on Defendants' Motion to Dismiss, the Court also considered additional allegations by the Plaintiff in making its determination that Plaintiff had sufficiently alleged a "materially adverse" employment action. *See* Memorandum Opinion at 9–10, ECF No. 23. Given Defendants' concession, the Court need not engage in a "cumulative effects" analysis on summary judgment. *Id.* at 10. However, the Court finds that considering what happened to Watkins prior to his non-renewal is material to the causation and pretext analyses.

evidence is probative of causation." *Jenkins*, 840 F. Supp. 2d at 881 (collecting cases).

Defendants argue that causation cannot be established, among other reasons, because of the length of time between Watkins' protected activity and the non-renewal of his employment. Defs.' Mem. at 26; Reply at 12–13. Watkins contends that despite the eight months between his September 2018 conversation with Boston and Hunter's May 2019 comment to Watkins that he would need to start looking for a new job, causation is established because of "what occurred between those two dates." Pl.'s Mem. at 21.

The record shows that Boston met with Watkins regarding his investigation of the complaints into Aristakesian on or around September 5, 2018. About three months later, on December 14, 2018, Watkins received a positive performance evaluation from Haywood and Stith commending him for "stabiliz[ing] the department" "during a period of change for the department and University." NSU Administrative and Professional Faculty Performance Appraisal, Pl.'s Ex. 2. Then, in January 2019, the Board passed a resolution requiring Board approval of various personnel actions and Wilmer informed Hunter he would lead the HR department in lieu of Haywood. LUMF ¶ 11; Hunter Dep. 16:1–10, Pl's Ex. 22. Wilmer likewise directed Hunter to bring in a consultant to review HR and hire a chief diversity officer. Hunter Dep. 16:17–17:3, Pl's Ex. 22. Based on the assessment of that consultant, Karen Gulliford, Hunter said he decided to non-renew Watkins' contract. LUMF ¶ 21; Hunter Dep. 167:7–9, Defs.' Ex. 2. This non-renewal was officially communicated to Watkins on August 20, 2020, but Hunter told Watkins that he should start looking for a new job a few months earlier, in May 2020. Letter from Gerald E. Hunter to Sylvester T. Watkins (Aug. 20, 2019), Pl.'s Ex. 18; Watkins Dep. 280:15–281:18, Pl.'s Ex. 29.

This chain of events could not lead a reasonable factfinder to infer causation. As a threshold matter, Watkins does not establish that Hunter—the decisionmaker who ultimately decided to non-

renew Watkins' contract—knew that Watkins had been investigating Aristakesian. Watkins Dep. 316:12–19, Defs.' Ex. 1; Hunter Dep. 167:7–9, Defs.' Ex. 2; *see Dowe* 145 F.3d at 657; *Roberts*, 998 F.3d at 125 ("[A] plaintiff [must] demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity."). Even if Hunter was aware, Watkins provides no basis to infer Hunter had a reason to retaliate against him. Hunter was not Watkins' supervisor at the time Watkins was investigating Aristakesian. And if Hunter had been intent on retaliating, he had an opportunity to do so much earlier when Watkins offered his resignation in March 2019. Watkins Dep. 247:1–21, Defs.' Ex. 1. Hunter's decision to allow Watkins to rescind his resignation weighs strongly against a finding of retaliatory animus. *See, e.g.*, *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). Taken together with the eight-month lapse in time between Watkins' conversation with Boston and first being told his contract would not be renewed, the Court finds that Plaintiff has not made out a prima facie case of retaliation.

3. Pretext

Even if Watkins were able to establish a prima facie case, he cannot show that NSU's reason for non-renewing his contract was retaliatory. Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff establishes a prima facie case, "the burden of production . . . shifts to the employer to articulate a . . . non-retaliatory reason for the adverse action," *Guessous*, 828 F.3d at 216. Then, if the employer can provide these reasons, "the burden . . . shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is . . . retaliatory." *Id*.

NSU cites the ongoing issues in the HR department as the basis for Watkins' non-renewal. According to Defendants, Watkins' supervisor was changed to Hunter in January 2019 to effectuate the Board's resolution requiring greater review of personnel actions taken by HR. Defs.' Mem. at 29. Hunter then brought in Gulliford to analyze the ongoing issues in HR and non-renewed Watkins' employment based on Gulliford's recommendation. *Id.* at 27.

Watkins argues that the real reason for the Board's actions in January 2019, which "set Watkins' demise into motion," was that Board members learned of his investigation of Aristakesian. Pl.'s Mem. at 25. As evidence of this, Watkins cites to the letter he purportedly[12] sent to the Board on December 13, 2018. *Id.* at 25; Letter, Pl.'s Ex. 8. That letter stated, in part, that:

> The unknown issue would be a previous employee of the Audit Department filed a complaint July 2018, prior to her departure, which alleged serious violations of DHRM and EEO policies and procedures, by the Audit department. Because these allegations are being investigated, it presents a significant conflict of interest in presenting portions of the equation to the board by the Audit department, instead of complete and objective facts.

> *Id.*

The day after he sent this letter, Watkins received a positive performance evaluation from Haywood and Stith. NSU Administrative and Professional Faculty Performance Appraisal, Pl.'s Ex. 2. According to Watkins, "[t]here is no evidence of any plausible alternative reason" for the Board's January 2019 actions given this positive evaluation. Pl.'s Mem. at 25.

This fails to establish pretext. First, as discussed above, it was Hunter who ultimately made the decision to non-renew Watkins' employment contract, and these allegations are directed at the Board. LUMF ¶ 21. Watkins does not establish Hunter knew of his protected activity. *Id.* ¶ 29.

---

12      *See supra* note 6.

Second, there is a plausible alternative reason for the Board's actions in January 2019—the Board's consideration of the results of Aristakesian's HR department audit.[13] Even if the Court were to conclude that the letter Watkins purported to have sent to the Board was received by the Board, presumably establishing the Board's knowledge of the Aristakesian investigation, this does not establish that the Board took the January 2019 actions because of this knowledge. At the very least, it is equally plausible that the Board took the January 2019 actions based on the audit report. Finally, even if the Court were to make each of the inferences above—that the letter established the Board's knowledge of Watkins' protected activity, that such knowledge could be imputed to Hunter,[14] and that Watkins' positive performance evaluation followed by the Board's actions "set[ting] Watkins' demise into motion" could only be explained by retaliatory animus—Watkins does not explain why Hunter would not simply have accepted Watkins' resignation two months later. It would be unreasonable for a factfinder to determine that a but-for cause of Watkins' non-renewal was retaliation for his investigation into Aristakesian. *Foster*, 787 F.3d at 252.

Watkins' additional pretext arguments fare no better. Watkins suggests that Gulliford's assessment of the HR department, Hunter's stated basis for non-renewing Watkins' contract, was "suspect." Pl.'s Mem. at 25. Watkins argues that Gulliford was not qualified to assess Watkins' performance as HR Director, that she only made notes of some employees she interviewed, and made recommendations that were inconsistent with the information she obtained in her staff

---

[13]     The Board's consideration of Aristakesian's audit is not well-documented in the record. However, Watkins' December 13, 2018 letter suggests that the Board received the results of the audit prior to that date. Letter, Pl.'s Ex. 8 (referencing the audit and contesting the "narrative presented" to the Board).

[14]     This would also be an impermissible inference for the Court to make because causation cannot be established based on "knowledge other employees may have had that could be imputed to the [relevant decisionmaker]." *Roberts*, 998 F.3d at 124.

interviews. *Id*. Watkins also alleges that NSU did not engage in a competitive process to hire her, and claims, without support, that Gulliford "misled" a University team that recommended to Hunter that Watkins be temporarily suspended in June 2019.[15] *Id*.

Watkins' characterization of Gulliford's review as a mere sham to drum up reasons to get rid of him is unavailing. Gulliford was not hired out of the blue—the parties do not dispute that the HR department was experiencing challenges. Aristakesian's audit of the HR department identified various concerns, such as "fraudulent claims for overtime," "improper hiring practices," and "nepotism." LUMF ¶ 9. Moreover, as discussed, if Hunter wanted Watkins gone, he could have accepted Watkins' resignation. The Court need not consider the adequacy of Gulliford's assessment. As the Fourth Circuit has explained, "it is not the courts' place to determine whether [an employer's] assessment of [an employee's] performance issues was 'wise, fair, or even correct, so long as it truly was the reason for [the] termination.'" *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 249 (4th Cir. 2020) (quoting *Laing*, 703 F.3d at 722). The remainder Plaintiff's pretext arguments likewise lack merit.[16]

---

[15]     In his Complaint, Watkins alleges that the suspension itself was evidence of pretext. Compl. ¶ 34. The Court finds this argument unavailing. This incident occurred a month after Hunter told Watkins that he should start looking for another job. *See* Hunter Dep. 155:16–22, Pl.'s Ex. 22. Moreover, Hunter's decision to suspend Watkins was based on the recommendation of a team who Watkins does not dispute was unaware of his protected activity. LUMF ¶ 24; Marable Decl. ¶ 4, Defs.' Ex. 15. Aside from temporal proximity, the Court finds no link between this decision and the ultimate non-renewal of Watkins' employment contract.

[16]     Watkins asserts that NSU previously "disregard[ed]" Martin's complaint against Aristakesian. Pl.'s Mem. at 23. This kind of generalized allegation against the University does not provide evidence that Hunter's reason for non-renewing Watkins' contract was pretextual. Watkins likewise asserts that Little had a "complete and conscious disregard" for the Martin complaint when Watkins assigned it to her and had an "almost complete disregard" for the complaint filed by Munday. *Id*. at 23–24. Watkins provides no support for his allegation that Little was intentionally disregarding the complaints, and more fundamentally, he fails to explain how allegations against Little, his subordinate, provide any evidence of pretext. Watkins also asserts that Stith asked Boston to meet with Watkins in order to "cloak the inquiry in secrecy." *Id*. at 24.

## IV. CONCLUSION

In summary, the Court finds that (i) Watkins has established that he engaged in protected activity, as defined by Title VII; (ii) Watkins has failed to show a causal connection between his non-renewal and his protected activity; (iii) Defendants have articulated legitimate, non-retaliatory reasons for their decision to non-renew Watkins' employment; and (iv) Watkins has failed to provide evidence that would allow a reasonable fact-finder to conclude that Defendants' stated reasons are pretextual. As a result, the Court concludes that Plaintiff has not demonstrated the existence of a genuine dispute of material fact as to his Title VII retaliation claim. Accordingly, Defendants' Motion for Summary Judgment, ECF No. 42, will be granted. Given this ruling on summary judgment, Plaintiff's Motion to Exclude Expert Testimony by Karen Gulliford, ECF No. 40, will be denied as moot.

An appropriate order shall issue.

_____
/s/
Elizabeth W. Hanes
United States District Judge

Norfolk, Virginia
Date: March 14, 2023

---

This is pure speculation. Boston and Watkins also waived claims of attorney-client privilege over their conversation. *See* Boston Dep. 51:2–9, Defs.' Ex. 18. Finally, Watkins claims NSU lied to the EEOC when the University stated it had not received a sexual harassment complaint against Aristakesian. Pl.'s Mem. at 26. There is no basis for this claim. As Defendants point out, neither the Munday nor Martin complaints mention sexual harassment, both reference only sex discrimination. Reply at 14 n.9.